DOUGHTEN SEED CO. ET AL. *v.* UNITED STATES (No. 3982)[1]

United States Court of Customs and Patent Appeals, November 30, 1936

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for appellants.
*Joseph R. Jackson,* Assistant Attorney General (*Richard E. FitzGibbon,* special attorney, of counsel), for the United States.

[Oral argument October 13, 1936, by Mr. Allerton deC. Tompkins and Mr. FitzGibbon]

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges

BLAND, Judge, delivered the opinion of the court:

A number of importations of white clover seed were made at various ports during the years 1932 and 1933, and the Collectors of Customs classified the goods under the provision for "white and ladino clover" of paragraph 763 of the Tariff Act of 1930, and assessed duty thereon at 6 cents per pound.

---

[1] T. D. 48686.

The importers protested and claimed the merchandise to be dutiable under the same paragraph as "clover, not specially provided for, 3 cents per pound," or as "all other grass and forage crop seeds not specially provided for, 2 cents per pound." Other claims were made in the protests but are not pressed here.

At the trial in the court below, no testimony was adduced by either side, but the cause was submitted upon analyses of the imported seed. Exhibit I, a typical analysis, shows the following percentages:

| | |
|---|---|
| White clover seeds | 96. 76 |
| Crop seed | . 83 |
| Inert matter | 1. 23 |
| Weed seed | 1. 18 |

The United States Customs Court, Third Division, overruled the protests and the importers have appealed to this court.

Paragraph 763 of the Tariff Act of 1930 follows:

PAR. 763. Grass seeds and other forage crop seeds: Alfalfa, 8 cents per pound; alsike clover, 8 cents per pound; crimson clover, 2 cents per pound; red clover, 8 cents per pound; *white and ladino clover, 6 cents per pound;* sweet clover, 4 cents per pound; *clover, not specially provided for, 3 cents per pound;* millet, 1 cent per pound; orchard grass, 5 cents per pound; rye grass, 3 cents per pound; timothy, 2 cents per pound; hairy vetch, 3 cents per pound; other vetch, 1½ cents per pound; bent-grass (genus agrostis), 40 cents per pound; bluegrass, 5 cents per pound; tall oat, 5 cents per pound; *all other grass and forage crop seeds not specially provided for, 2 cents per pound: Provided,* That no allowance shall be made for dirt or other impurities in seed of any kind. [Italics ours.]

The sole issue in the case, according to appellants' brief, is:

* * * the interpretation to be given to the language, "white and ladino clover," the plaintiff contending that the said provision covers only importations of a combination of white clover seed and ladino clover seed, and that it does not cover importations of white clover not mixed with ladino clover seed.

In support of the contention of appellants that the term "white and ladino clover" must be held to include only a combination of white clover seed and ladino clover seed, they have cited a number of cases by this and other courts in which it was held that the term "and" was used in the conjunctive rather than the disjunctive sense in the language there construed. Among such authorities are *Manhattan Shirt Co.* v. *United States,* 17 C. C. P. A. (Customs) 93, T. D. 43428; *Rice et al.* v. *United States,* 53 Fed. 910; *Edgar Allen Steel Co.* v. *United States,* 16 Ct. Cust. Appls. 26, T. D. 42715, and *Bayersdorfer & Co.* v. *United States,* 7 Ct. Cust. Appls. 66, T. D. 36390. A number of other cases in which "and" was construed as not meaning "or" are cited. It will not be necessary for us to discuss here the last referred to cases. Appellants have also cited a great number of cases, including some by this court, to the effect that where there is no ambiguity the statute must be interpreted as written and that the grammatical sense of the words must be accepted.

The issue in the *Manhattan Shirt Co.* case, *supra*, was not sufficiently analogous to the issue at bar as to require here a discussion of the case.

In the *Rice* case, *supra*, the Circuit Court of Appeals held that the term "embroidered and hemstitched handkerchiefs" included only handkerchiefs which had been both embroidered and hemstitched. For the most part the case turned on the grammatical construction of the phrase, and the application of the principle *ita lex scripta est*.

The *Bayersdorfer & Co.* case, *supra*, holds that the term "artificial and ornamental flowers" covered only those flowers which were both artificial and ornamental. In this case, as in the *Rice* case, *supra*, the ordinary grammatical construction of the phrase was adopted, nothing showing a different Congressional intent.

In the *Edgar Allen Steel Co.* case, *supra*, a majority of this court held that the term "steel containing molybdenum and tungsten," contained in the Tariff Act of 1922, was not ambiguous, and that no absurdity, or conflict with other parts of the statute, would result if it were given the definite meaning ordinarily attributed to such expressions containing the conjunction "and." That case also followed the long line of authorities which stated the well-settled rule that it amounts to judicial legislation to distort the ordinary meaning of language in order to reach such a result as the court thinks Congress should have reached. The majority of the court in that case found nothing which would indicate Congress did not intend to include within the term only such steel as contained both molybdenum and tungsten.

The Government, in support of its contention that we should affirm the decision of the trial court, cites a number of cases in which the word "and," when used under circumstances quite similar to those at bar, was given the meaning of the word "or", a disjunctive meaning, or given a meaning other than that which grammatical rules would ordinarily suggest. It will not be necessary to discuss all these cases. Prominent among them are *The Blakeley*, 234 Fed. 959; *Dumont v. United States*, 98 U. S. 142, *Northern Commercial Co. et al. v. United States*, 217 Fed. 33; *United States v. Bertrose Co.*, 11 Ct. Cust. Appls. 275, T. D. 39083, and *United States v. Gavin & Co.*, 7 Ct. Cust. Appls. 292, T. D. 36804.

Running through all the decisions involving issues similar to the one at bar there is found the well-settled principle that courts may construe the words "and" and "or" to have a meaning different from that arrived at by a strict grammatical construction, if by so doing the different provisions of the paragraph or act can be harmonized, and anomalous results avoided. Of course, in considering language used in a tariff act, there need be no construction if there exists no ambiguity, but if anomalous results flow from the language when given its ordinary grammatical meaning, and if such construction

throws different parts of the paragraph or act out of harmony, its use unquestionably has produced ambiguity and uncertainty to the extent and degree which makes applicable the rule that courts may ignore the technical grammatical meaning and ascertain the real intent of the legislature.

In this connection it would be well to keep in mind the very apt and forceful language used by the Supreme Court in an opinion by Chief Justice Taft, in *United States* v. *Stone & Downer Co.*, 274 U. S. 225–244, 252, wherein our adherence to the maxim *ita lex scripta est* in considering the term "clothing wool" was disapproved. There it was said:

If the language of the statute is such that such results can not be avoided, of course it must be enforced accordingly. If Congress by its language has made a mistake, and so has failed in its purpose, this Court can not supply by its decision the omission of a necessary legislative provision to effect its purpose. With the intent of the Act clearly in mind, however, we must see whether it is true that the language used can only bear the construction insisted upon by the importers and upheld by the Court of Customs Appeals, or whether there is a broader and more reasonable construction that can be fairly placed upon the statute which will serve the plain Congressional purpose.

     \*       \*       \*       \*       \*       \*       \*

\* \* \* In other words, the pole star of interpretation of statutes, whether it be of tariff acts or any other, must be the intention of Congress, when that can be clearly ascertained and is reasonably borne out by the language used.

Neither in the briefs presented to us nor in the opinions of the courts below has there been a suggestion of a reason why Congress should have distinguished, in its attempt to avoid the demoralization of the wool markets in this country and to increase the revenue, between carding wool and combing wool. The only argument of the Court of Customs Appeals is, *ita lex scripta est;* and the answer to the argument must be, that it is not so written and that the language is easily capable of being construed in accordance with the Congressional intention.

In the case here under consideration the same answer, "it is not so written", can be made to the same argument with, at least, equal propriety.

The appellants state, in substance, that the Government's position is comparable to arguing that the phrase "a group of strong and mighty men" means a group of men, some of whom were strong and some of whom were mighty. The Government counters with the proposition that the contention of the appellants leads to the conclusion that the expression, "a group of black and white men," would mean a group of men, each of whom was part black and part white.

We think the lower court reached the right conclusion. To interpret the term as appellants ask us to do would bring about a result which we think is not in harmony with the obvious purpose of Congress in enacting the legislation. It is admitted that ladino clover is one kind of white clover. The importers quote from a report issued by the

United States Department of Agriculture in November 1921, as follows:

Ladino or giant white clover is a very large form of the common white clover so abundant in bluegrass pastures and lawns throughout the United States. In every respect the Ladino clover is similar to the ordinary white clover except that in favorable locations it grows 10 to 20 inches high and is two to four times larger in all its parts.

     *     *     *     *     *     *     *

A wise plan in seeding ladino clover is to seed it in mixture with timothy, brome grass, or orchard grass, rather than alone.

The character of changes made in the Tariff Act of 1930 over that of the Tariff Act of 1922, the context of the new provision and of the predecessor paragraph in the Tariff Act of 1922, and the anomalous results which would flow from giving the term "white and ladino clover" its ordinary grammatical meaning produces such ambiguity and uncertainty as fully to justify seeking elsewhere such light upon the Congressional intent as may be safely obtained.

As far as we have been advised, it was at the hearings before the Ways and Means Committee of the House of Representatives that the term "ladino clover" was mentioned for the first time in connection with any tariff legislation. The legislative history shows that at the time the Tariff Act of 1930 was being prepared by the Ways and Means Committee, the domestic seed growers, including clover seed producers of Oregon, represented that there should be a high duty levied upon ladino, as well as white clover. White clover was provided for at 3 cents per pound under the then existing law, but there was no mention therein of ladino clover. Congress was told that the seed of ladino clover could not be distinguished by customs officers from common white clover seed, that the same rate should apply to both clovers.

The expression "ladino and white clover" is found in a letter from the agronomist of the Oregon State Agricultural College, addressed to the Ways and Means Committee, which was then preparing the bill which became the Tariff Act of 1930. See Hearings, 70th Congress, 2nd Session, Vol. VII, page 4867. In it is found the following language:

Ladino and white clover: These are pasture clovers produced for seed in Oregon and rather high priced. There should be a tariff of not less than 15 cents a pound on Ladino, and since the seed cannot be distinguished by customs officers from common white, the same tariff should obtain in both cases.

As introduced, the bill provided for "white and ladino clover, 5 cents per pound." In the House of Representatives, the provision was amended to read "white and ladino clover, 6 cents per pound," as it is now found in the act.

Evidently, for reasons which seem to be obvious, Congress was impressed with the fact that ladino clover should be made dutiable at a higher rate of duty than that which would be levied against "clover,

not specially provided for," or against that which was dutiable under the catch-all provision for "all other grass and forage crop seeds, not specially provided for," and that it should have the same rate of duty as white clover seed, which, in the Tariff Act of 1922 had been provided for at a higher rate of duty than that provided for clover seed in the not specially provided for provision and in the catch-all provision.

There is nothing in the legislative history or in the context of the paragraph under consideration, or the predecessor paragraph in the Tariff Act of 1922, which even remotely suggests that Congress, by the use of the term "white and ladino clover" intended to make these two kinds of clover, when imported separately, bear a lower rate of duty than they would bear if mixed and imported in the mixed condition, but, on the contrary, they indicate that this was not the legislative intent. Since the Congress was engaged in raising the tariff duty on clover seed and many other grass and forage crop seeds, what possible reason can be given why it should use language which would bring about such an anomalous result as appellants here contend for? If appellants are correct in their contention that "white and ladino clover" includes only the two when mixed, would not the same kind of result logically flow from a construction of the phrase "all other grass and forage crop seeds," found later in the paragraph. In the latter instance, only such seeds could be included in that provision as were a mixture of both grass crop seeds and forage crop seeds. Appellants might also argue with as much plausability as characterizes their contentions concerning white and ladino clover seed that by the grass and forage seed provision only one kind of seed is covered—a seed that produces both grass and forage.

The Government here urges that the provision in the paragraph for white and ladino clover should be held to be "a provision for two distinct commodities whether imported separately or mixed."

We agree with this construction of the involved language. We are not giving "and" the meaning of "or" so as to require that a mixture of ladino and white clover would be taken out of the provision in controversy. The question as to whether Congress intended that the term "white and ladino clover" should include a mixture of the two, while not strictly before us for decision, is, to some extent, involved in the proper construction of the language. See the *Gavin* case, *supra*. If white clover seed could not be distinguished by the customs officers from ladino clover seed, and if both were to bear the same rate of duty, Congress must have intended that if the two were mixed when imported, they would bear the same rate of duty as if either were imported separately. Under such circumstances as are at bar, courts are privileged to depart from the ordinary grammatical construction

of conjunctive phrases. This principle is abundantly supported by the above authorities cited by the Government.

In the *Bertrose & Co.* case, *supra,* the merchandise consisted of pen and ink drawings. The importer contended that they were dutiable under the phrase "original drawings and sketches in pen and ink or pencil and water colors." The Government insisted that to come within the provision it not only had to be a drawing in pen and ink or pencil, but also a water color. From the "manifest intendment of the paragraph," this court held that if they were pen and ink drawings or pencil drawings, it was not necessary for them also to be water colors in order that they find classification under the provision, and said:

We think, therefore, that the final phrase "and water colors," contained in the provision should be interpreted as a permissive term rather than an exclusive and restrictive one. This view is so convincingly supported by the manifest intendment of the paragraph that we feel justified in reading the conjunctive word "and" of the phrase as if it were written "or." The rule permitting this construction in proper cases is too familiar to require a citation of authorities.

In the *Gavin & Co.* case, *supra,* the merchandise consisted of trimmings, ornamented with beads and spangles. The statute provided for articles in chief value of "beads or spangles". This court held that under that language, if they contained both beads *and* spangles, they met the requirements of the statute; in other words, as applied to the particular merchandise then at bar, "or" was given the meaning of "and". However, the court there found itself in a position quite comparable to the one confronting us here, and in the opinion by DeVries, Judge, is contained the following language:

The issue as presented is not satisfied by the determination whether the word "or" shall be read as "and," for that conclusion leaves us confronted with the result, if strictly followed, that only such articles are dutiable under the provision as are ornamented with both beads *and* spangles. No reason is apparent from the language of the paragraph why Congress should have intended either such limited application. Congress provided in the first part of the paragraph that "beads *and* spangles" should bear the same rate of duty (35 per cent ad valorem), and in the latter part that all articles in chief value of beads should bear the same rate of duty as all articles in chief value of spangles (50 per cent ad valorem). Therein the statute conclusively evidences the purpose to treat beads and spangles, whether as such or as parts of ornaments, alike for dutiable purposes. Having thus enacted, no purpose is apparent from the act or disclosed by the record that Congress intended a different rate should be applied upon an article wherein beads and spangles together constituted the chief value of the article. On the contrary, this conceded uniformity of accorded rates upon each, beads and spangles, in whatever condition found, argues a purpose of Congress to treat them alike or as one subject for dutiable purposes. In the presence of this expressed purpose of Congress, and in the view that both conjunctions "and" and "or" read in any other sense would not only defeat the purpose of Congress manifested by the words of the paragraph but lead to an absurd result, the court is of the opinion that the phrase "beads or spangles," as used in paragraph 333,

was so used as a collective subject of legislation, *embracing all articles composed of either or both of its elements.* [Last italics not quoted.]

The trial court reached the right conclusion in overruling the protest, and its judgment is *affirmed.*

GARRETT, Judge, concurs in the conclusion.

GRAHAM, Presiding Judge, concurring:

I concur with the opinion and judgment of the court in this case. I feel it proper, however, to remark that I think the decision is not in harmony with the opinion and judgment of the majority of this court in *Edgar Allen Steel Co.* v. *United States*, 16 Ct. Cust. Appls. 26, T. D. 42715, in which I expressly stated my reasons for dissent, and to which I refer.